UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
UNITED STATES OF AMERICA,  :
                                                                  :
                -against-  :  **MEMORANDUM AND ORDER**
                                                                  :         17-CR-103 (DLI)
KELVIN JONES,  :
                                                                 :
                           Defendant.  :
-------------------------------------------------------------------x

**DORA L. IRIZARRY, Chief United States District Judge:**

      Defendant Kelvin Jones ("Defendant") is charged with possession with intent to distribute cocaine base, unlawful use of a firearm, and being a felon in possession of ammunition, in violation of 21 U.S.C. § 841(a)(1), 18 U.S.C. §§ 924(c)(1)(A)(i), and 922(g)(1). On July 18, 2017, Defendant moved to suppress physical evidence and statements he made to law enforcement officers at the time of his arrest. (*See* Motion to Suppress ("Mot. to Suppress"), Dkt. Entry No. 24.) Defendant submitted an affidavit in support of his motion. (*See* Exhibit A to Mot. to Suppress ("Jones Affidavit").) On August 7, 2017, the government responded. (*See* Motion to Suppress Government's Response ("Mot. to Suppress Resp."), Dkt. Entry No. 26.) On August 22, 2017, Defendant replied. (*See* Reply to Response to Motion ("Mot. to Suppress Reply"), Dkt. Entry No. 27.)

      The Court held an evidentiary hearing on Defendant's motion, which began on November 16, 2017, and continued on December 14, 2017 and January 17, 2018.[1] New York City Police ("NYPD") Officers Brian Alexander, Conway Hughes, Sonya Senra, and Randy Sanchez, and NYPD Sergeant Darnell Simon testified for the government. (*See* Transcripts of

---

[1] The evidentiary hearing originally was scheduled for September 13, 2017, but could not go forward because the government had failed to disclose Civilian Complaint Review Board ("CCRB") material regarding some of the testifying officers, in violation of *Giglio v. United States*, 405 U.S. 150 (1972). The Court admonished the government about its failure to comply with its duty to disclose *Giglio* materials multiple times during the hearing, before the government ultimately fully complied with its disclosure obligations.

the November 16, 2017, December 14, 2017, and January 17, 2018 Evidentiary Hearing ("Tr.").) Defendant introduced one exhibit, but no witness testimony.

The Court permitted the parties to submit post-hearing briefing. On February 16, 2018, Defendant filed a brief in support of his motion to suppress. (*See* Letter Post-Hearing Brief in Support of Motion to Suppress ("Post-Hearing Brief") Dkt. Entry No. 66.) On March 9, 2018, the government opposed. (*See* Letter Post-Hearing Brief in Opposition of the Defendant's Motion to Suppress ("Post-Hearing Opp'n"), Dkt. Entry No. 67.) On March 20, Defendant replied. (*See* Letter Post-Hearing Reply Brief ("Post-Hearing Reply"), Dkt. Entry No. 68.)

For the reasons set forth below, the Court finds that the police did not have reasonable suspicion to stop Defendant, making the seizure of physical evidence and his post-stop statements inadmissible. Accordingly, Defendant's motion to suppress is granted.

## I. Findings of Credibility

The Court finds only the testimony of Officers Senra and Sanchez credible. The Court finds critical portions of the testimony of Officers Alexander and Hughes and Sgt. Simon incredible.[2]

## II. Findings of Fact

On the night of January 12, 2017, Officers Alexander and Hughes and Sgt. Simon[3] of the 79th Precinct Anti-Crime Unit, were on duty in the Bedford Stuyvesant area of Brooklyn. (Tr. at

---

[2] The government's belated *Giglio* disclosures revealed that Officer Alexander had one substantiated CCRB complaint for improperly searching, frisking, and questioning a civilian in an April 2015 car stop, and one partially substantiated Internal Affairs Bureau ("IAB") investigation for an October 2015 car stop and search. (*See* Letter as to Kelvin Jones, Dkt. Entry No. 29.) Officer Alexander was named as a defendant in two separate lawsuits in Kings County Supreme Court, involving allegations of false arrest and improper search. *Id.*

[3] Brian Alexander was promoted to the rank of sergeant and Darnell Simon was promoted to the rank of lieutenant since the events in question took place. (*See* Post-Hearing Opp'n at n.1, 2.)

7:3-7; 63.2-5; 80:16-22.) They were in plain clothes and driving in an unmarked police car. (Tr. at 7:11-14; 8:1-2; 8:5-6; 63:8-13; 80:25-81:6; 82:2-3.)

On January 12, 2017, at approximately 11:30 p.m., the officers were driving along Herkimer Street, near New York Avenue, and stopped in front of the gate to the courtyard at Restoration Plaza. (Tr. at 8:16-24; 12:18-22; 63:14-17; 63:21-24; 81:7-24; 82:4-9.) Officer Hughes drove the vehicle; Officer Alexander sat beside him in the passenger seat; and Sgt. Simon sat in the back seat, directly behind the driver. (Tr. at 12:18-22.) During their drive, the officers saw three men walking toward Herkimer Street. (Tr. at 12:23-13:3; 63:18-20; 68:1-2; 83:4-6.) Officer Hughes testified that, from the vehicle, he saw one of the men, identified as Defendant, motioning his hand toward the midsection of his waistband and making a gripping motion. (Tr. at 12:23-13:23; 36:3-7.) Sgt. Simon testified that, from the vehicle, he saw Defendant adjusting his waistband, which indicated to him that Defendant possibly was concealing a firearm. (Tr. at 65:1-3.) Officer Alexander testified that he saw a silver object sticking out of Defendant's waistband, and "believed that [Defendant] was trying to conceal a firearm." (Tr. at 83:13-22.) On direct examination Officer Alexander testified that he first observed the silver object sticking out of Defendant's waistband while he was sitting in the vehicle, but on cross examination, Officer Alexander testified that he first observed the silver object when he was outside of the vehicle. (Tr. at 83:13-25; 129:14-18.) Officer Hughes testified that he said aloud, "You see that, you see that," but neither Officer Alexander nor Sgt. Simon corroborated that statement. (Tr. at 16:14-19.) Despite their alleged observations, no officer specifically stated at the scene that he thought Defendant had a gun. (Tr. at 64:23-25; 129:23-25.)

As they exited the vehicle to approach Defendant, the officers saw Defendant turn left on Herkimer Street and they spoke to the other two young men at the scene, who allegedly stated, "[h]e's not with us," referring to Defendant. (Tr. at 14:9-13.)

Both Officers Hughes and Alexander testified that, when Officer Alexander exited the car, he identified himself as police, and commanded Defendant to stop. (Tr. at 16:20-25; 65:13-18; 85:17-20.) Officer Alexander added that he was wearing a police shield on a chain around his neck at the time, but Defendant did not acknowledge him. (Tr. at 85:21-24; 86:5-6.) When Defendant did not stop, Officer Alexander chased him. (Tr. at 86:7-10.) Defendant ran eastbound on Herkimer Street towards Brooklyn Avenue, and turned right onto Brooklyn Avenue. (Tr. at 18:7-14.) Sgt. Simon followed on foot and Officer Hughes followed by car. (Tr. at 17:6-18:18; 65:12-20.) All three officers testified that they observed Defendant shaking his leg as he ran. (Tr. at 17:6-17; 66:6-8; 87:11-12.)

Officers Randy Sanchez and Sonya Senra were on duty that night as part of the Target Team from the 79th Precinct. (Tr. at 143:17-144:8, 163:23-164:12.) Both officers were in uniform. (Tr. at 147:25-148:1; 164:24-25.) At approximately 11:30 p.m., Officers Sanchez and Senra were walking down Brooklyn Avenue toward Herkimer Street. (Tr. at 147:21-148:3; 149:1-6; 164:20-23; 165:14-20.) As she approached the corner of Herkimer Street and Brooklyn Avenue, Officer Senra heard yelling and someone screaming "stop." (Tr. at 167:4-11.) She looked around the corner and saw a man, identified as Defendant, running towards her. (Tr. at 167:21-168:2.) Officer Senra tackled Defendant to the ground. (Tr. at 150:13-20.) Officer Sanchez drew his weapon. (Tr. at 151:4-6.) Both officers testified to seeing a plain clothes NYPD officer round the corner onto Brooklyn Avenue in pursuit of Defendant. (Tr. at 151:7-17; 169:18-24.) Officer Sanchez recognized Officer Alexander as a member of NYPD because he

4

wore a "color of the day arm band," but did not state that he saw a police shield hanging down from his neck on a chain. (Tr. at 151:10-12.)

Officer Alexander testified that when he turned the corner onto Brooklyn Avenue, he saw Defendant face down on the ground with two uniformed officers standing in front of him. (Tr. at 87:16-24.) Officer Alexander placed Defendant in handcuffs. (Tr. at 88:10-11; 151:25-153:2; 169:20-24.) Officers Hughes and Senra and Sgt. Simon then canvassed the area that Defendant had traversed during the chase to see if he had dropped any weapons or contraband, but they did not find anything. (Tr. at 19:9-10; 66:22-67:3; 170:15-25.)

Officer Alexander then searched Defendant. (Tr. at 88:10-13.) Officer Alexander recovered four bags of crack cocaine and cash from Defendant's jacket pockets. (Tr. at 88:12-24; 152:7-12.) Officer Alexander asked Defendant if he was running because of the crack cocaine, and Defendant said, "No, I'm going to tell you the truth. I have a gun on me." (Tr. at 89:2-8; 152:13-16.) Officer Alexander testified that he searched Defendant's pants down by his calf area and recovered a firearm, which was loaded and cocked. (Tr. at 89:12-14; 152:17-19; 171:1-5.)

Officer Alexander testified that Defendant asked him how much time he would get. (Tr. at 90:20-22.) Sgt. Simon testified that he heard Defendant say that he had found the gun in the bushes near Applebee's in Restoration Plaza. (Tr. at 67:17-20.)

### III.  Conclusions of Law

The Fourth Amendment's prohibition on "unreasonable searches and seizures" extends to "brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu,* 534 U.S. 266, 273 (2002); *United States v. Cortez,* 449 U.S. 411, 417 (1981); *Terry v. Ohio,* 392 U.S. 1, 16 (1968); *United States v. Elmore,* 482 F.3d 172, 178 (2d Cir. 2007). Fourth Amendment protections are invoked at the moment when a suspect is "seized" or stopped

by the police. *Brendlin v. California,* 551 U.S. 249 (2007). The Fourth Amendment is satisfied if the officer's action in stopping Defendant is supported by reasonable suspicion to believe that Defendant is engaged in criminal activity. *Arvizu*, 534 U.S. at 273. The investigatory stop must be justified by some objective manifestation that the suspect is, or is about to be, engaged in criminal activity. *Cortez*, 449 U.S. at 417.

In evaluating whether reasonable suspicion for a stop exists, courts must consider the "totality of the circumstances" in order to determine whether the officer has a "particularized and objective basis for suspecting wrongdoing." *Arvizu,* 534 U.S. at 273. While the reasonable suspicion standard does not rise to the level required for probable cause, and, in fact, falls considerably short of satisfying a preponderance of the evidence standard, an inchoate suspicion or mere hunch will not suffice. *Id*. at 274; *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000).

Here, the Court must determine whether the government established that the police had reasonable suspicion to stop and search Defendant. The Court finds that the government has failed to meet its burden. The Court comes to this conclusion after hearing the disturbingly largely incredible testimony of the three primary police officers involved. "The credibility of witnesses on a motion to suppress is for the district court hearing the testimony to determine." *United States v. Williams,* 2007 WL 643051, at *3 (E.D.N.Y. Feb. 26, 2007) (citing *U.S. v. Vita,* 294 F.2d 524, 528 (2d Cir.1961)).

The government advances three arguments in support of its position that the police officers had reasonable suspicion to stop Defendant: (1) all three officers saw Defendant making hand motions around his waistband; (2) Defendant ran away from the police car; and (3) Defendant was shaking his leg while running. (*See* Post-Hearing Opp'n at 9-11.)

6

A. <u>Waistband Hand Motions</u>

The government asserts that the officers had reasonable suspicion to believe that Defendant was engaged in criminal activity because they observed Defendant "making hand motions around his waistband." (*Id.* at 9.) Officer Hughes testified that he observed Defendant "holding his waistband as if he was holding the imprint of a gun" and saw "[t]he imprint of a firearm." (Tr. at 12:23-13:23.) On cross-examination, Officer Hughes clarified that he did not see the handle of a firearm or the outline or imprint of a firearm, but that the way in which Defendant adjusted his waistband appeared to Officer Hughes like a gripping motion, characteristic of holding a firearm. (Tr. at 34:17-36:13.) Sgt. Simon testified that he observed Defendant "adjusting his waistband. He was placing his hands inside his waistband of his pants." (Tr. at 64:2-7.) Officer Alexander testified that he observed "a silver object sticking out of [Defendant's] waistband and he was pushing it down into his pants." (Tr. at 83:13-17.) From his observations, Officer Alexander concluded that Defendant "was trying to conceal a firearm." (Tr. at 84:20-22.) None of the officers conveyed to the others that they thought Defendant had a gun.

Even if the Court were to credit the officers' statements, there are myriad innocent explanations as to why Defendant may have been adjusting his waistband. Defendant could have been loosening his belt, scratching an itch, pulling up his pants, or retrieving a legal item from his waistband. As the court in *United States v. Doughty* explained:

> there are a myriad of innocent explanations for Defendant's conduct. He could have been simply hitching up his pants or tucking in his shirt. And the fact that neither officer saw a bulge-a telltale signs of weapons possession-makes it less likely that his suspicion was that of an objectively reasonable police officer. . . Thus, this factor too would not, standing alone, sufficiently elevate a reasonable officer's suspicions to the level where the officer is permitted to stop and detain the suspect for questioning.

7

2008 WL 4308123, at *6 (S.D.N.Y. Sept. 19, 2008). *See also United States v. McCrae,* 2008 WL 115383, at *3 (E.D.N.Y. Jan. 11, 2008) (finding that when Defendant "mov[ed] his hand from the center of his stomach to the left side of his waist, [Defendant] did not move in a sufficiently suspicious manner to justify the stop.") *Cf. United States v. Sanders,* 208 F.3d 204 (2d Cir. 2000) (affirming a finding of reasonable suspicion where, among other factors, the officer saw the defendant's "hands adjust something at [his] waistband and then conceal the waistband by pulling down [his] shirt" and the defendant's "gaze remained fixed over his shoulder at the police checkpoint while he adjusted the object in his waistband.")

The officers' alleged observations must be evaluated in context. The observations were made at night. There was scant testimony about the quality of the light conditions that wintry night. It is difficult to ascertain whether the light that there may have been illuminated Defendant from behind or from the front. Notably, Defendant's arrest photo, Government Exhibit 4, showed Defendant was wearing a large bubble jacket and bulky sweater, loosely lying over and outside his pants. It is difficult to fathom how any officer could have seen the outline of a gun or a silver handle in the waistband through the clothes. *See United States v. Mayo*, 960 F. Supp.2d 419, 422 (E.D.N.Y. 2013) (finding no reasonable suspicion in part because an open hoodie that hung below the waistband would obscure the weapon from the officers' view).

The Court further is reluctant to credit fully the officers' statements because the officers failed to communicate to each other the possibility that Defendant had a concealed firearm. It is purely a matter of common sense that the possible possession of a concealed firearm by a suspicious person is a matter of security for the police officers on the scene and any civilians in the vicinity. The Court finds it incredible that this possibility was not communicated. Moreover, although equipped with radios, at no time did any of the officers call over the radio to inform

area officers that they were chasing a suspect who possibly was armed. As the Honorable John Gleeson, Retired U.S. District Judge of this Court, wrote in *Mayo*, 960 F. Supp.2d at 423:

> But there is one undisputed fact that dwarfs all others in undermining the testimony of these officers that they saw a firearm in Mayo's waistband before anyone exited the car: their mutual silence at the time about that critically important fact. Few things are more important to the safety of the public and especially of the police themselves when they stop a suspect than the presence of a firearm. A firearm on the scene is a big deal even to the most experienced officers, and the cases evidencing that reality are legion. The government would have me believe that [the officer] saw a firearm in Mayo's waistband and then let both [his partner] and his sergeant exit the car to stop him without even mentioning to them that the person they were about to stop was carrying a gun. It would have me believe that [the officer] decided he wanted to stop Mayo and also decided to communicate that decision to his colleagues but chose not to mention *why* he wanted to stop him. It would have me believe that an officer who said he wanted to stop someone, apparently for no reason, chose not to tell his immediate supervisor the one fact that would make the stop lawful.

*See also United States v. Price,* 2014 WL 558674, *4 (E.D.N.Y. 2014).

Not only did the officers in the vehicle fail to mention the firearm to each other, but Officer Alexander failed to warn Officers Sanchez and Senra that the individual they had apprehended was armed because the information never was sent over the police radios they all carried. This behavior is contrary to Officer Alexander's purported own best practices. Officer Alexander testified that when he stops an individual who is suspected of carrying a weapon, he always is concerned about his safety, the safety of his partners, and the safety of the public. (Tr. at 128:13-20.)

Finally, Officer Alexander's testimony was inconsistent. First, he testified that he directed Officer Hughes to stop the car after seeing the silver object in Defendant's waistband, and later testified that he believed that Defendant was concealing a firearm, "[a]fter I got out of the car and began to approach him." (Tr. at 83:13-25; 129:14-18.)

Given the officers' implausible testimony, the Court finds that Defendant's waistband hand motions did not provide the officers with reasonable suspicion to stop him.

B. <u>Defendant's Flight</u>

The government asserts that the officers had reasonable suspicion to stop Defendant when they saw Defendant "turn away and switch directions" and "walk away from [the officers]." (Mot. to Suppress Resp. at 2, 10.) At that point, Officer Alexander allegedly "approached the defendant from behind, identified himself as a police officer, and stated, "Police. Don't move. Stop," and Defendant ran off. (*Id.* at 3.)

The Supreme Court has held that "[n]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975). However, "when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." *Id.* (citing *Florida v. Royer,* 460 U.S. 491 (1983)).

The moment at which Officer Alexander and Officer Hughes exited their vehicle and approached Defendant, ordering him to stop and then running after him, was the moment they seized Defendant. "Examples of circumstances that might indicate a seizure . . . would be the threatening presence of several officers, . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Serrano*, 695 F. App'x 20, 22 (2d Cir. 2017) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Officer Hughes testified that Officer Alexander "exited the car and actually approached the defendant commanding him to stop, stop, stop for the police, stop for the police, police don't move." (Tr. at 16:20-25.) Sgt. Simon testified that Officer Alexander began to chase Defendant before he even identified himself as police. (*See* Tr. 65:12-15. ("At that point, I observed Officer

Alexander proceed to give chase to the defendant. He stated that he was police. Told the defendant to stop," and testifying that this occurred prior to Defendant running away.)) In fact, Officer Alexander testified that, upon seeing Defendant's waistband hand motions, he "exited the car and attempted to stop [Defendant]." (Tr. at 84:16-17). Officer Alexander testified, "I told him police, stop. I repeated that numerous times. I told him police, hold up." (Tr. at 85:17-20.)

Defendant was not "free to disregard [police] questions and walk away" when Officer Alexander ordered him to stop, as evidenced by the fact that two officers proceeded to chase him on foot and one officer chased him by car, leading to his being tackled to the ground by the uniformed officers. *C.f., Mendenhall,* 446 U.S. at 553-54 ("As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.")

At the time of the seizure, the officers lacked reasonable suspicion to stop Defendant because they were relying entirely on Defendant's hand motions around his waistband (*See supra*), and the fact that Defendant turned away from the officers and continued to walk (not run) in the direction of his home. Although the government refers to Defendant's movement as "turning away" from the police, Defendant was exiting the parking lot of Restoration Plaza onto Herkimer Street and had to turn right or left in order to remain on the sidewalk. (*See* Tr. at 12:23-13:3 ("[Officer Hughes] saw three black males walking towards Herkimer Street out of Restoration Plaza courtyard"; Tr. at 83:4-6 "[Officer Alexander] observed three males walking out of the courtyard of the rear of restoration plaza.") Defendant turned in the direction of his home, rather than into the unmarked police vehicle, which was parked "in front of the gate" of Restoration Plaza. (Tr. at 26:4-8.) *See United States v. Freeman*, 735 F.3d 92, 102 (2d Cir. 2013)

(finding that the police lacked reasonable suspicion when they approached defendant because defendant "certainly had the right to ignore the officers and continue on his way. [Defendant] merely continued walking in the same direction, and ostensibly at the same pace.").

Even if this Court were to consider Defendant's flight from the officers as justification for the stop, as the government urges, this factor does not amount to reasonable suspicion. In *Wardlow*, the Supreme Court held that the search of the defendant did not violate the Fourth Amendment when the defendant fled upon seeing a four car police caravan and patrolling uniformed officers. 528 U.S. at 121. The Court found that the defendant "fled upon seeing police officers patrolling an area known for heavy narcotics trafficking." *Id. See also U.S. v. Stone*, 225 F.3d 647, *3, n.4 (2000) (finding that, as in *Wardlow*, defendant "fled upon his discovery that police were in the vicinity," but noting that, because the district court had rejected the appellant's assertion that he fled because he feared the individuals and did not know that they were police officers, the court could not distinguish *Wardlow*.)

Here, the Court cannot find that Defendant "fled upon his discovery that police were in the vicinity." *See Id.* According to Defendant, he saw the driver of a black car (the unmarked police vehicle) talking to the two young men who had been walking in front of Defendant. Defendant continued to walk down Herkimer, towards his home at 280 Herkimer Street. He then "heard a car door close and someone say 'Hey.' [He] kept walking, and continued walking after hearing someone say, 'Hey, you.' [He] heard footsteps running behind [him], and [he] started running. [He] heard someone shouting and heard a car speeding up." (Jones Affidavit ¶ 4.) Defendant asserts that "[b]efore [he] was chased, [he] did not hear anybody announce that they were police." (*Id.* ¶ 6.)

Although Officer Hughes and Sgt. Simon testified that they heard Officer Alexander

identify himself as an officer, by stating "police, stop," it is plausible that Defendant was not aware that Officer Alexander was law enforcement. (Tr. at 85:17-20.) The officers were in plain clothes and in an unmarked vehicle. Officer Alexander testified that he wore a shield around his neck, but Defendant's back was turned away from Officer Alexander, such that the shield may not have been visible to him. (Tr. at 85:21-24.) Officer Alexander testified that Defendant did not acknowledge him, despite repeating "police, stop" several times. (Tr. at 86:7-10.) Officer Alexander, "attempted to jog, so [he] could get closer," at which point, Defendant ran. (*Id.*) If Officer Alexander was so distant from Defendant that he needed to run after him to get his attention, it is plausible that Defendant did not see the shield around Officer Alexander's neck or detect signs that the plain clothes individual yelling and running after him at night was a police officer.

Furthermore, Officer Sanchez, whose testimony the Court credits fully, stated that he heard Officer Alexander "screaming, stop," but did not testify that he heard him identify himself as police. (Tr. at 150:9-12.) Officer Sanchez did not recognize the situation as a police chase until he saw that Officer Alexander wore the color of the day band on his right arm. (Tr. at 151:10-12.) Notably, he did not mention seeing any shield hanging from Officer Alexander's neck. Similarly, Officer Senra, whose testimony the Court also fully credits, testified that when the screaming became audible, she heard Officer Alexander yell, "stop, stop," but did not testify that she heard him identifying himself as a police officer or that the suspect had a gun. (Tr. at 168:3-6.)

The Court finds that the officers did not have reasonable suspicion to stop Defendant based upon his flight because the chase was instigated when plain clothes individuals exiting an unmarked car, at night, began to yell at and run after Defendant. *See also United States v. Bell*

256 F. Supp.3d 222, 235 (N.D.N.Y. 2017) (finding that officers did not have reasonable suspicion although defendant fled because defendant was startled when the officer, who was in plain clothes, exited an unmarked patrol vehicle at night in a high crime area).

C. Defendant's Shaking Leg

Lastly, the government contends that the officers' observations of Defendant "shaking his leg as he was running . . . furthers the reasonableness of the officers' belief that the defendant was in possession of a gun." (Post-Hearing Opp'n at 11.) Defendant asserts that "[d]uring the chase, I did not shake anything down my pants leg." (Jones Affidavit ¶ 6.)

Officer Alexander's search of Defendant belies his alleged observation that Defendant was shaking a firearm down his pants leg. Officer Alexander first searched Defendant's jacket pockets, from which he recovered crack cocaine and money. (Tr. at 89:2-5.) He then asked Defendant "if this was the only thing that he was running for." (*Id*.) Only then, after Defendant revealed that he also had a firearm, did Officer Alexander search for the weapon. (Tr. at 89:2-14.) The Court cannot conclude that the officers had reasonable suspicion to search Defendant based upon his leg shaking. *See United States v. Parker,* 1999 WL 997282, at *5 (E.D.N.Y. Oct. 18, 1999) (finding no reasonable suspicion where defendant exited a livery cab awkwardly with his right hand dragging behind him); *See also United States v. Bellamy,* 592 F. Supp.2d 308, 318 (E.D.N.Y. 2009) ("furtive behavior absent additional indicia of suspicion generally does not suffice to establish reasonable suspicion").

## IV. Conclusion

For the reasons set forth above, Defendant's motion is granted and the physical evidence seized from Defendant as well as his statements made on January 12, 2017 are suppressed. As there was no reasonable suspicion to stop Defendant in the first instance, any physical evidence seized from him must be suppressed. *See Wong Sun v. U.S.*, 371 U.S. 471, 490 (1963). In addition, as the stop was unlawful, any statements made by Defendant as a result, also must be suppressed as a product thereof. *See Taylor v. Alabama*, 457 U.S. 687 (1982).

SO ORDERED.

Dated: Brooklyn, New York
       March 29, 2018

                                        /s/
                              DORA L. IRIZARRY
                                 Chief Judge